In the Matter of the Estate of ROBERT J. STRASENBURGH, Deceased.

Surrogate's Court, Monroe County, September 17, 1937.

*Sutherland & Sutherland* and *Castle & Fitch* [*J. Sawyer Fitch* and *A. E. Sutherland, Jr.,* of counsel], for the executor.

*Kenneth B. Keating,* for Union Trust Company.

*C. N. Roberts,* special guardian.

*Whitbeck & Dye,* for Genesee Valley Trust Company.

FEELY, S.   About fifteen months after testator's death a partial judicial settlement of his estate was had in June, 1929, and many of the legacies in the will were then satisfied; but as the result of the depression that set in during the fall of 1929, some contingent liabilities unexpectedly accrued, and recourse was thereafter had to this estate to carry the liability of testator's coindorsers in some real estate ventures; and after a proceeding was had for reclamation of the assets that had been transferred under the settlement decree in July, 1929, as aforesaid, it finally became apparent that the assets now on hand would not be sufficient to pay all the creditors in full.

After the liquidation of this estate had been conducted through those several proceedings, had during the seven years following the testator's death and during the depression, the discovery was made, in a judicial settlement proceeding in 1935, that among the residuary legatees there were, in a group of eight infants, two who had never been made parties to any of the aforesaid proceedings. Thereupon the present proceeding was begun by the executor to obtain a decree ratifying, as respects those two omitted infants,

all the foregoing decrees and proceedings. The six other infant parties in interest were bound by all of the decrees entered on this estate, and particularly by the decree of judicial settlement of June 15, 1929.

The claim has been made in the instant proceeding that this 1929 decree was inconclusive as to everybody in that it failed to settle the accounts then before the court. This decree recites an application " for a judicial settlement " of the executors up to that date; and the issuance of a citation for that express purpose; the appointment of a special guardian for those six infants; and then the decree continues: " Having found the state and condition of said account and supplemental account to be as stated, as set forth therein, as filed by said executor, the Surrogate proceeded to settle all matters pending before the Court for settlement, as follows." Then several incidental points were decided; the assets and liabilities set out in a summary, on the figures of which an award of commissions was made, together with an allowance to the then special guardian with reference " to the examination of the executor's accounts in connection with this intermediate judicial settlement " thereof. These figures became the basis for the decrees subsequently entered.

It is literally true that in its decretal section the 1929 decree does not expressly order, adjudge and decree that the accounts be deemed settled as filed, pursuant to the finding above quoted; but in the face of the recital of the court having found the account to be as filed, and of the court having proceeded to settle all the matters pending before the court for settlement in that proceeding, the absence of this formal decretal provision is obviously due to a merely clerical omission. However, the decree was not binding on the two omitted infants.

Under his appointment for all of the eight infants in this proceeding for ratification, the present special guardian, in his amended objections, sets out nineteen points; and about them the present discussion centers. They might be summarized by saying generally that they charge the executor with neglect and inaction in so many particulars. While it is true that in retrospect one can now see more clearly what might have been done to forestall the losses entailed by the depression, had foresight then been as good as is hindsight now, still the charge that the executor " did nothing " is an ambiguous one. Not giving any thought whatever to the matter in hand would have been culpable, but not having taken any procedural or like steps after having investigated and deliberately taken a position, even though in the outcome it proved to be a mistaken one, does not amount either to inaction, or to negligence;

nor does the taking of steps that in the end proved not as wise as might have been. The executor asserts that the present situation is not one that can legally be charged to the executor; and that six of the guardian's objections are academic, for the reason that his wards, those two infant residuary legatees, could not, in any way, benefit even if those six objections were sustained; and that the creditors, who are the only ones that might raise these questions, are not urging them; and are already precluded by the decrees heretofore entered on this estate. In other words, the executor's claim is that these two infants, being residuary legatees, have no ground to make the third objection, that income was paid, under the preceding clauses of the will, to testator's widow, instead of being applied to remove the contingent liabilities above mentioned; nor to make the fourth objection, that she likewise received certain stock rights under peculiar provisions of the will; nor the fifth objection, that under a like clause certain stock, household goods, effects, and an automobile have been delivered to the legatee; nor to make the ninth objection, that certain stock, specifically bequeathed, had been delivered under a preceding clause of the will to the legatee named; nor with respect to the dividends thereon, under the tenth objection, for by law the dividends passed as accessories to the specific principal bequeathed to others than these two infant residuaries; neither were these infants aggrieved by the delivery of the farm to John H. Strasenburgh, to whom it had been specifically devised, on the ground that in this respect also the eleventh objection raises a point that is now merely academic. The special guardian's claim is, in general, that something might have been left for his wards had the liquidation of this estate taken a course other than it did.

Taking up this varied issue somewhat in the order of time, one may first say generally that the source of much of the present trouble lay in testator's contingent liabilities in certain real estate ventures, which, in the universal optimism that prevailed up to the depression, were then thought to be such as would surely " work out " successfully of themselves, as some of them were actually then doing in so far as they had then gone up to that crisis. Two of them, however, the Denstras Corporation and the Wentworth Company, then were yet to show like tangible results. The others still have assets of some value, not presently available.

Testator, with some of his business associates, made joint ventures in the speculative boom in land in the vicinity of Main Street East and East avenue. When he died he owned half the stock, and his business associate, Mr. Strohm, the other half of the stock of the Denstras Realty Corporation, which held an equity in a lot on the

■■■■■■■■■■■■■■■■

northeast corner of Main Street East and Gibbs street, diagonally opposite the Eastman Theatre, on which they had a building still in course of erection when testator died. Testator was personally liable to the extent of $152,000 on the purchase mortgage indebtedness on this parcel, totalling $200,000; and he had indorsed this corporation's notes to the Genesee Valley Trust Company for $140,000. He was also involved in similar ventures hereinafter mentioned, mostly with other persons, in the comparative sense that this Denstras Corporation might have been classed as almost a " one man " company belonging to testator. In his last will, dated June 19, 1925, testator had authorized his executor and trustee to retain in their then present form any and all of his property; and before he went out of the city in 1928 for his winter holidays on the coast he left here with his associate certain written provisions for paying the current building costs; but his accidental death out there on March 23, 1928, made these notes and checks unavailable; and shortly thereafter both the executor and also the owner of the other half of the stock of this Denstras Company in July of 1928 each put up $15,000, which was applied partly toward the completion of the building and the rest on mortgage interest. During that period, both the testator and the co-owner of the company stock believed there was considerable equity in this property, and so did the executor. In the circumstances, the payment of $15,000 by the estate was authorized and justified for the preservation of what at that time was honestly believed to be an asset of value in this estate.

This Denstras Company, aside from that equity, had about $1,500 in cash when testator died. This corporation owed the Genesee Valley Trust Company six notes aggregating $140,000, falling due from April 6 to June 20, in 1928, each of which bore the personal indorsement of testator and of this business associate, Mr. Strohm. Both of these men well knowing the company then was, and for a long time would be, unable to meet any of its notes at maturity, the testator, on the eve of his departure for his ill-fated vacation, left with his business associate signed blanks for the renewal of this paper, and for the purpose of carrying out a resolution of the board of directors of the maker corporation that testator individually would advance the corporation, on a mortgage on its equity, $100,000 " to reduce the bills payable account at the Genesee Valley Trust Company." Testator's sudden death interrupted these plans somewhat, but he himself can well be said to have had in the last days of his lifetime all the knowledge that a notice of protest could give, and more, of the maker's irresponsi-

bility and undoubtedly impending default on all this paper. It is of no consequence that the notices of protest were not addressed to his executor as such. These notices came in due course to the executor, both in that notices addressed to the testator at his place of business were at once given over to the executor, and also in that his business associate and coindorser also promptly gave the executor all the information a notice of protest is designed to convey. Meantime, an officer of the executor corporation had been elected to the directorate of the maker company, for the purpose of keeping in touch with its financial condition. The claim of the payee on these notes against the estate as that of an indorser, is a valid claim.

As the Denstras building neared completion, the lower floor was leased to the Monroe County Savings Bank for use as its branch office. This property had cost the company $435,000; and the testator, five days before his death, had wired his associate, Mr. Strohm, that at least $550,000 should be their option price. While the opinions of higher values in that vicinity were still being entertained, some of the directors of the tenant bank, shortly before the death of testator, began to negotiate orally and tentatively with Mr. Strohm with a suggestion toward fixing a price that their bank would pay $400,000 for the property; but these men refused to make an offer in writing. Upon their report to the board of directors of the bank the latter, instead of adopting the committee's recommendation to make an offer of $400,000, merely resolved " that the committee be continued for the purpose of negotiating with the present owner." Mr. Strohm, who owned half the stock of the Denstras Corporation, and was one of its directors, had a conference with the officers of the corporate executor, and thereupon Mr. Strohm with others then comprising a quorum of the board of the Denstras Corporation resolved their corporation's sale price be $510,000; and this figure was presented by Mr. Strohm, on behalf of the owner corporation, to the committee of the tenant bank in June, 1928, but the bank board rejected it. The Denstras Corporation did not thereupon follow up this matter any further, apparently in the belief that the value of this property was nearer to the testator's figure than it was to the bank's figure. Its only prospect had been a sale at a figure lower than cost. Not until over a year later did the inflated prices in that vicinity begin to fall to much lower levels. Mr. Strohm does not appear during the period of the negotiating to have made any protest against the action then taken by his corporation; and in January, 1929, he quoted Weed & Co. the price of $500,000; but later on, when it had

become apparent that they might better have taken a relatively small loss by accepting $400,000, he naturally took the position that the more expensive error of judgment could not be charged up against him.

On that state of fact it cannot be said that the executor of the estate that had a minority representation on the board of directors of the owner corporation became liable to the estate for not having obtained $400,000 for the property of this Denstras Corporation. The evidence does not warrant a finding that the deceased stockholder's executor negligently failed, at any time, to dispose of the property of the Denstras Corporation, or that " it did nothing." In so far as the executor corporation could, it did give due attention to this matter. The executor was bound to, and did, exercise judgment in respect to it. The duty of an executor to pay the testator's debts does not mean he must sell against his best judgment, nor within seven months, or any other set time, especially in such a state of the market as generally prevailed through the period of the negotiations and for a considerable time afterward. Bad as later developments might evince that judgment to have been, it was still " good " judgment, if honest; and no dishonesty has been charged in this respect. The mere failure to have accomplished a result that now seems clearer in hindsight to have been feasible had another course been followed, does not prove the failure was due to lack of reasonable foresight or negligence at the prior time.

With the depression came also the decline in the marketing of realty and land securities that affected also the value and prospects of testator's one-fifth of the stock of the Brighton Realty Corporation, which had been theretofore successfully engaged in marketing an equity in a rather expensive subdivision of east side vacant land, and also affected the value of this testator's equal interest as a copartner with four others in the Mortgage Securities Company, which also had been theretofore successfully engaged in marketing second mortgages, and some thirds, on a comparatively more advanced but less valuable real estate development on the northern side of the city. The main business of this copartnership was the discounting of junior mortgages on residential properties that had been built or sold by the Buyahome Corporation, in which also the members of the copartnership were interested. Testator had become personally liable as a coindorser with the four others on the notes of each of these concerns, some of which was held by the Union Trust Company.

Up until the crash the universally prevailing opinion was that these land investments were good, and would work out profitably

of themselves; and in fact, for the years 1928 and 1929, they did so in those two cases. An early investigation of the mortgage company was made for the executor by one of its own employees, which resulted in a report in May, 1928, on the value of those junior mortgages to the effect that they were well secured, and would ultimately be paid in full, although they could not then be made to realize enough to pay the indebtedness of the firm. The Brighton Realty Company was moving its lots quite satisfactorily, but was making some improvements. In July, 1929, the bank found this company to be in excellent shape, its prospects good, and its management satisfactory.

When the crash came, the Brighton Company's sales fell off greatly, and it was then seasonably ascertained that the mortgage company was involved beyond what any one had had reason to suspect; and also that some of the coindorsers were not then as financially responsible as their prior statements had indicated; and that others were responsible only to a very limited extent, if at all; and that testator's estate would probably have to bear more than its full share of the contingent liabilities. In several conferences among all adult parties in interest, including two other banks holding such indorsed notes, it was agreed from time to time that it would be the wiser course in the then depressed state of the market to refrain from immediate liquidation and enforced contribution; and some measure of success along this line was achieved.

Now the criticism is rather that liquidation was not enforced before the depression happened. In the light of subsequent events, of course, it can be urged that had the executor been foresighted enough before the crash to have then pressed the point to an immediate conclusion, a different result might have been achieved. The charge is too broad that it " did nothing " in the premises. In the circumstances, it cannot now be held for not having done better than it did at the time.

In connection with the Brighton Realty stock and liability, the entry of a deficiency judgment against this corporation necessitated some procedural maneuvers to preserve the prior equities and prospects of the parties just as they had stood before the docketing. The intention of the parties clearly was to maintain intact the *status quo* as against the deficiency judgment and its threat of enforced liquidation and interference with the sale of lots; so that the steps taken later to that end cannot now be interpreted so literally and technically as to frustrate the common agreement then made that a new corporation would be formed, under the name of " Brighton-

dale, Inc.," to take over the assets of the old corporation upon their being passed over to the new corporation, through the mechanism of a foreclosure of a mortgage owned by the bank, which was prior to the judgment. When that passing over had been done, the original liabilities were restated in the form of new notes to the bank from the same parties, except the one that was signed by the executor on the basis of the pre-existing and continuing liability of the testator and his estate. The net result was to preserve the assets and prospects of the Brighton Realty Company, for the benefit of the prior interests, without increasing the liability. The original status was thus maintained to the advantage of the testator's estate as well as to that of the others concerned.

As some security to testator against his indorsement of certain then existing notes of the companies mentioned, there was later offered, without request from testator, to him by Judge Remington, who with his son Thomas was associated with testator in those realty ventures, an assignment of certain mortgages and life insurance policies in which the judge and his son had an interest, but in some cases not an entire interest. Testator laid the assignment away by itself in the safe in the office of his main business corporation; and later told the assignor to forget the transaction. Thereupon some of those mortgages were paid to the assignors; and not replaced with substitute collateral as the wording of the assignment required. It was not until some months after testator's death that this assignment was first discovered and brought to the knowledge of the testator's executor. Thereupon the executor, after investigation and advice by its then attorney, deferred pressing the assignment for a time; but later made diligent effort to realize upon the basis of that assignment, and met with some success, owing to the co-operation of the assignors, who could have legally and successfully resisted had they chosen so to do.

There had been adopted by the executor, the legatees and the creditors the policy of co-operation, rather than compulsion, with the coindorsers, as aforesaid; as testator's coindorsers were themselves in the throes of liquidating their own personal affairs quite as much as was the testator's estate. At no time were any of his associates as wealthy as was he; and they were each quite as much spread out and involved in the boom as was he.

In following out the common policy of co-operation, two of the collateral policies mentioned in the " Remington " assignment, having a cash surrender value of less than $700 were released by the executor to the assignors, who put them up as security to the executor corporation in its capacity as a bank. The latter also

made loans to the coindorsers individually. The latter were thus assisted somewhat to better their own financial status; and this in a roundabout way improved the executor's prospect of relief from contribution for others; but before the coindorsers' financial situation had improved to the extent that they could contribute to the relief of their deceased coindorser more than they had succeeded in actually doing, which was relatively considerable, their resources became either exhausted or presently unproductive. Looking backward, it may be said that a different course by the executor might possibly have increased their contribution; but the fact that the course adopted in the circumstances did no better than aforesaid — bad faith not having been charged — does not now warrant a surcharge on the executor for either negligence or inaction.

Similarly, in the reclamation proceeding, the executor, for the reasons aforesaid, cannot be held for not having obtained better results than it did; nor does the evidence warrant a finding of lack of reasonable foresight in the delivery of the specific stock to the legatees at a time when it was commonly thought the contingent liabilities of the estate would be removed in due course.

The computation of commissions in the decree of 1929 is questioned by the present special guardian; as is also the omission of the contingent liabilities from both tax returns. Even if it were assumed that those matters might ultimately necessitate some changes in the state of account in so far as the two omitted infants are concerned, which is doubtful, especially in the latter case, still in view of the findings herein made, neither of those matters is of any practical value to them.

A like observation can be made of the special guardian's demand that the executor be charged individually with the expense of this proceeding, and the same can be said also of the delivery of the specific stock, etc.

The omission from the judicial settlement proceedings of two of the necessary infant parties was probably occasioned by the fact that the testator, their grandfather, at the time he made his last will, a little less than three years before his death, gave to his daughter, Lois S. Burns, the use of a residual share for her life, and at her death he gave the principal to Frederick Strasenburgh Burns. This person last mentioned was then the only child that Lois S. Burns had, testator's only grandchild then in that branch of the family, and a resident of New York city. In the following thirty-three months between the date of the will and the death of the testator, two more children were born of Lois S.

Burns. None of her three infants were required to be cited in the probate proceeding, because their mother had outlived her father, the testator. Only a notice of legacy ran to Frederick, her son. But a year and a half later, when the judicial settlement of 1929 was brought on, her three infants had then, for the first time, a standing which rested solely on a legacy of $5,000 made by testator, in general terms, to each grandchild living at the time of his death.

In the judicial settlement proceeding of 1929 there was cited only the infant Frederick, the only grandchild mentioned by name in the will in the Burns branch of the family. There was appointed therein for Frederick S. Burns and five other infants a special guardian, other than the present one, on the nomination of the family, with whom, generally, he was well acquainted. The proponent's attorney, now deceased, was a member of another firm, one of which had drafted the will for the testator. Among them all — the executor, the then special guardian, the deceased attorney for the proponent, and the parents of these infants — it was assumed that all the interested parties had been brought into court. Probably, a more careful preparation of the accounting proceeding by the petitioner's attorney therein would have brought to attention then the two pretermitted infant legatees in the group of eight. Whatever may have been the recitals in the order appointing that guardian, the fact remains that no actual jurisdiction had then been obtained of these two infants. However, in view of the findings above made, the omission can neither profit them anything now in dollars and cents, nor charge them in any wise. Unfortunately, the oversight has entailed a very lengthy and multifarious proceeding, in which the labor of the court has been greatly lightened by the careful and comprehensive summaries that have been submitted by the present special guardian, and by the several counsel in the case.

On notice, or appearance, submit for signature and entry a decree in accord with this decision, dismissing the objections filed herein, and ratifying the proceedings heretofore had herein.